UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON


CHARLES JOHNSON,

      Plaintiff,

v.                                    Case No. 2:09-cv-00901

NAOMI ROBERTS, Wexford Health
Services Administrator,
WEXFORD HEALTH SOURCES,
DR. EMIL DAMEFF, Wexford Regional Director,
JANET PAYNE, Unit Manager, Mount Olive
Correctional Complex,
TIM WHITTINGTON, Associate Warden of
Operations, Mount Olive Correctional Complex,
DAVID BALLARD, Warden,
Mount Olive Correctional Complex, and
JAMES RUBENSTEIN, Commissioner,
West Virginia Division of Corrections,

      Defendants.


## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court are the following motions: a Motion to Dismiss filed by defendants Janet Payne, Tim Whittington, David Ballard and James Rubenstein (docket sheet document # 18) and two motions filed by Plaintiff Charles Johnson requesting that this civil action not be dismissed (## 16 and 17).  This matter is assigned to the Honorable Joseph R. Goodwin, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. §

636(b)(1)(B).

## **PROCEDURAL HISTORY**

Plaintiff filed his initial Complaint (# 2) on August 5, 2009. On December 10, 2009, defendants David Ballard, Janet Payne, Jim Rubenstin and Tim Whittington (hereinafter "the DOC Defendants") filed an Answer to the Complaint (# 14).  On December 21, 2009, defendants Emil Dameff, Naomi Roberts and Wexford Health Sources (hereinafter "the Wexford Defendants") filed an Answer to the Complaint (# 15).[1]

On December 23, 2009, Plaintiff filed a Response to the Answer filed by the DOC Defendants, including a motion requesting that his Complaint not be dismissed (# 16).  On January 5, 2010, Plaintiff filed a similar Response to the Wexford Defendants' Answer, and a motion requesting that his Complaint not be dismissed (# 17).

On February 8, 2010, the DOC Defendants filed a Motion to Dismiss (# 18) and a Memorandum of Law in support thereof (# 19). Plaintiff filed a Response to the Motion to Dismiss on March 5, 2010 (# 20).  The DOC Defendants filed a Reply on March 12, 2010 (# 21).  On March 23, 2010, Plaintiff filed Motion for Leave to File a Sur-Reply (# 22).  The Motion for Leave has been granted by separate Order, and the court will consider Plaintiff's Sur-Reply

---

[1]  The undersigned notes that the Wexford Defendants did not file a Motion to Dismiss, and the case has moved forward into the discovery phase between Plaintiff and those defendants.  A separate Time Frame Order will be entered setting deadlines for discovery and dispositive motions for those parties.

(# 22).  This matter is ripe for determination.

**STANDARD OF REVIEW**

The DOC Defendants have filed a Motion to Dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In <u>Bell Atlantic Corp v. Twombly</u>, 550 U.S. 544, 555 (2007), the Supreme Court observed that a motion to dismiss should be granted if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the non-moving party, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  <u>Id.</u>

The Supreme Court further explained its holding in <u>Twombly</u> in <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009), a civil rights case. The Court wrote:

> Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted).  Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id.*, at 556. * * *

3

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

129 S. Ct. at 1949-50.

## ANALYSIS

### Deliberate indifference standard

In <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" <u>Id.</u>, at 833.

To sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." <u>Id.</u>, at 834. (Citations omitted.) The Supreme Court rejected an argument that an objective test of deliberate indifference be established.

4

> We hold instead that a prison official cannot be found
> liable under the Eighth Amendment for denying an inmate
> humane conditions of confinement unless the official
> knows of and disregards an excessive risk to inmate
> health or safety; the official must both be aware of
> facts from which the inference could be drawn that a
> substantial risk of serious harm exists, and he must also
> draw the inference.

Id., at 837.

Plaintiff's Complaint alleges that the defendants have exhibited a deliberate indifference to Plaintiff's serious medical needs, in violation of his Eighth Amendment rights. "In order to state a cognizable claim for denial of medical care under the Eighth Amendment, an inmate must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see also Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (collecting cases). "Serious medical needs" are those which have been diagnosed by a physician as mandating treatment or that are so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Munic. of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990).

> Deliberate indifference may be demonstrated by either actual intent or reckless disregard. <u>See</u> <u>Benson v. Cady</u>, 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. <u>See</u> <u>id.</u> Nevertheless, mere negligence or malpractice does not violate the Eighth Amendment. <u>See</u> <u>Estelle</u>, 429 U.S. at 106.

<u>Miltier</u>, 896 F.2d at 851-852.

The burden of demonstrating deliberate indifference to a serious medical need by correctional officials and health care providers is very high. It is well settled that:

> A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. <u>See</u> <u>Farmer</u>, 511 U.S. at 832-35; <u>Sosebee v. Murphy</u>, 797 F.2d 182-83 (4th Cir. 1986); <u>Loe v. Armistead</u>, 582 F.2d 1291, 1296-97 (4th Cir. 1978).

<u>Rush v. VanDevander</u>, 2008 WL 495651 (W.D. Va., Feb. 21, 2008); <u>Banks v. Green Rock Correctional Center Medical Dept.</u>, 2007 WL 2903673 (W.D. Va., Oct. 3, 2007). For example, in <u>Sosebee</u>, the Fourth Circuit found that if prison guards were aware that a steak bone had pierced an inmate's esophagus, causing infection that resulted in the inmate's death, and the guards had intentionally abstained from seeking medical help, such conduct <u>might</u> establish deliberate indifference to a serious medical need.

In <u>Webster v. Jones</u>, 554 F.2d 1285 (4th Cir. 1977), the plaintiff, who had complained numerous times of eye problems and loss of vision, claimed that he was cursorily examined after his

initial complaint, but never re-examined despite later complaints. The doctor claimed that he examined Webster several times, but never diagnosed a medical problem with his eye. <u>Id.</u> at 1286. Subsequently, a specialist found that Webster's vision had deteriorated to 20/400 and that he suffered from a detached retina and iritis, and that his vision could not be restored. <u>Id.</u> The Fourth Circuit found that, even if the doctor had been negligent in failing to properly diagnose or treat Webster, negligence is not sufficient to demonstrate deliberate indifference to a serious medical need and, thus, Webster's allegations did not constitute a cognizable constitutional claim. <u>See also</u>, <u>Johnson v. Quinones</u>, 145 F.3d 164, 168 (4th Cir. 1998).

Likewise, disagreements between a health care provider and the inmate over a diagnosis and the proper course of treatment are not sufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review. <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985); <u>Russell v. Sheffer</u>, 528 F.2d 318, 319 (4th Cir. 1975). As noted by the Fourth Circuit, an inmate is not entitled to unqualified access to health care and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate. <u>Bowring v. Godwin</u>, 551 F.2d 44, 47-48 (4th Cir. 1977).

## Allegations in Plaintiff's Complaint

In his Complaint documents, Plaintiff has chiefly complained that the defendants have been deliberately indifferent to his serious medical needs concerning an injury to his left knee. Plaintiff's Complaint alleges that, on June 15, 2008, Plaintiff injured his knee playing softball at MOCC. (# 2 at 12, "FACTS" ¶ 1).  Plaintiff alleges that, on June 16, 2008, he was seen by Dr. Obenza in the medical department at MOCC, and an x-ray was ordered. Dr. Obenza initially thought there were ligament problems.  (Id., ¶ 2).

On July 7, 2008, Dr. Obenza ordered another x-ray.  Plaintiff alleges that Dr. Obenza told him there could be one of three things wrong: blood on the muscles, ligament damage, or broken bones. (Id. at 13, ¶ 3).  On July 9, 2008, Plaintiff alleges that he spoke with Defendants Whittington and Roberts and that Roberts informed him that he had a fracture of his knee cap or a dislocated knee. (Id., ¶ 4).  On July 10, 2008, Plaintiff saw Dr. Gajendragadkar, who said there was no fracture or dislocation, and although he thought there was definitely something wrong with Plaintiff's knee, he indicated that he did not believe an MRI would be helpful.  Dr. Gajendragadkar prescribed Bengay and Ibuprofen for Plaintiff. (Id., ¶ 5).

On July 31, 2008, Plaintiff alleges that he saw Physician's Assistant Pamela Ramsey, who examined Plaintiff for approximately

8

45 minutes and stated that she did not understand why he had not been sent out for an MRI. Plaintiff alleges that Ramsey said she would talk to the doctor about making a referral for an outside consultation. (Id. at 13-14, ¶ 6).

During August of 2008, Plaintiff indicates that he and his aunt both spoke with Cheryl Chandler, the Warden's Executive Assistant, about Plaintiff's condition. Plaintiff further alleges that Chandler spoke with defendant Roberts, who denied that Ramsey had requested a referral to an outside physician or for an MRI for Plaintiff. (Id. at 14, ¶¶ 7-8). Plaintiff alleges that this was not the first time that defendant Roberts had refused or prohibited a referral for Plaintiff. Plaintiff states that she also blocked a prior request by Dr. Obenza, stating that she could not find the referral. (Id., ¶ 9).

Plaintiff alleges that he saw Dr. Gajendragadkar and Pamela Ramsey again in August 2008, because his pain was getting worse. (Id. at 14-15, ¶ 10). Plaintiff alleges that he also had a discussion with Ms. Chandler and defendant Ballard about his condition, and that they allegedly indicated to defendant Janet Payne, Plaintiff's Unit Manager, that "they would give the Doctor and Wexford 6 months to do something." (Id., ¶ 11).

On September 5, 2008, Plaintiff states that he again saw Pamela Ramsey, who gave him a knee brace. Ramsey allegedly denied Roberts' statement that Ramsey had not requested a referral to a

9

specialist.  (Id., 12).  On October 2, 2008, Plaintiff states that he saw Dr. Gajendragadkar, who filled out paperwork for a referral in front of Plaintiff.  (Id., ¶ 13).

On December 22, 2008, Plaintiff was again seen by Pamela Ramsey, who renewed his pain medication and filled out another referral form in front of Plaintiff.  (Id. at 16, ¶ 15).  On December 26, 2008, Plaintiff alleges that Dr. Gajendragadkar informed him that he would be taken out to see a specialist.  (Id., ¶ 16).

However, on January 5, 2009, Plaintiff was called to a meeting with defendants Whittington, Payne, and Roberts, along with Pamela Ramsey and Dr. Gajendragadkar.  Plaintiff alleges that Dr. Gajendragadkar and PA Ramsey informed everyone at the meeting that they had filled out requests for referrals for Plaintiff to be taken out to have an MRI and to see a specialist, but defendant Roberts denied this.  Plaintiff alleges that defendant Roberts intentionally failed to submit the referrals.  (Id., ¶ 17).[2]

On January 21, 2009, Plaintiff alleges that he was brought to medical to be seen by defendant Roberts, along with defendant Emil Dameff, Wexford's Regional Medical Director, and a Dr. Loudin.[3]

---

[2]  The undersigned notes that the paragraphs in Plaintiff's Complaint are misnumbered from this point forward (there are two paragraphs numbered as 16).  The undersigned will amend the numbering and will refer to the corrected paragraph numbers.

[3]  The correct spelling of this doctor's name is apparently "Lauder."

Plaintiff's Complaint specifically alleges as follows:

> Defendant Dameff, being the Regional Medical Director for
> all of the prisons, asked me to tell him the problem.  He
> did not and would not physically touch or examine me.
> Instead, he proceeded to very unprofessionally tell[] me
> to "stop" and that there was no way that what I said was
> happening was happening.  My knee was severely swollen at
> the time.   Defendant Dameff literally threw me out of
> [medical], had security take my cane and knee brace, and
> told me that I was not going to get an MRI or see an
> outside Doctor.  He also stated that if I went out there
> and fell, that I did it on purpose.  Dr. Loudin examined
> me later and stated that she felt that it was my muscles
> and that my ACL was okay.  She didn't know for sure.

(<u>Id.</u> at 16-17, ¶ 18).

On January 26, 2009, Plaintiff's aunt spoke to defendant Whittington, who informed her that Dr. Dameff had stated that Plaintiff's problem was muscular, and that he needed to walk on the leg.  However, Plaintiff alleges that walking on the leg aggravated his pain.  Defendant Whittington allegedly told Plaintiff's aunt that "he couldn't go over the doctor's head."  (<u>Id.</u> at 17-18, ¶ 19).

On March 24, 2009, Plaintiff was again seen in medical and alleges that he was told by a Nurse Peschko that there "was nothing more that medical can or will do" for Plaintiff's knee problem, and that she was not going to inform the doctor or physician's assistant about his current complaint.  (<u>Id.</u> at 18, ¶ 20).

Plaintiff's Complaint further alleges that, although his pain medication prescription has been renewed several times, he has had trouble getting medications for glaucoma, an eye infection, and a

severe skin rash; being made to go weeks at a time without this needed medication.   Plaintiff also alleges that an unnamed Unit Team Manager was told by another unnamed individual that, if Plaintiff did not quit asking about his medication, she would have him locked up.   (Id. at 18, ¶¶ 21-23).

Plaintiff alleges that defendants Ballard and Rubenstein have affirmed "generic" responses to Plaintiff's grievances, without taking any action to make sure Plaintiff was receiving the proper care.   (Id. at 19, ¶ 24).   Plaintiff further alleges that Dr. Gajendragadkar has told him that he believes that Dr. Dameff was wrong and that he should have been sent out for an MRI.   (Id. at 20, ¶ 16).   Plaintiff states that he has become addicted to his pain medication.   (Id., ¶ 27).[4]

### THE DOC DEFENDANTS' MOTION TO DISMISS

The DOC Defendants' Motion to Dismiss and Memorandum of Law in support thereof contend that, to the extent that the DOC Defendants have been sued in their official capacities, they are immune from a suit for monetary damages under the Eleventh Amendment; that to the extent that they have been sued in their individual capacities, they are entitled to qualified immunity on Plaintiff's claims for

---

[4]  As will be further discussed below, on October 30, 2009, two months after Plaintiff filed his Complaint, an MRI was performed on Plaintiff's knee.   The MRI report indicated that there was a tear of Plaintiff's medial meniscus.   (# 20 at 8-9).

monetary damages against them; and that the Complaint fails to state a cognizable Eighth Amendment claim against them.

The DOC Defendants' Memorandum of Law in support of their Motion to Dismiss addresses the immunity from monetary damages provided to state agencies and their officials under the Eleventh Amendment to the United States Constitution. <u>See</u> <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989); <u>Pennhurst State School & Hosp. v. Halderman</u>, 465 U.S. 89 (1984). (# 45 at 8-12). Under this authority, the DOC and its agents and employees in their official capacity are immune from monetary damages. Thus, to the extent that Plaintiff has sued the DOC Defendants in their officials capacities, they are immune from monetary damages.

However, should Plaintiff be able to state a cognizable Eighth Amendment claim against any of the DOC Defendants, they could be held liable for prospective injunctive relief. The undersigned notes, however, that the injunctive relief Plaintiff requested in his Complaint was to have an MRI performed and to have a consultation with a specialist. It appear that these actions have now taken place and that these requests for relief are now moot. Plaintiff also requests that his medications for his various other ailments be given to him without delay.

To the extent that Plaintiff has sued these defendants in their individual capacities, public officials are also not liable for monetary damages if they can show that their conduct did not

13

violate clearly-established statutory or constitutional rights of which a reasonable person would have known.  See Wilson v. Layne, 526 U.S. 603, 609 (1999).  Qualified immunity exists to protect officers in the performance of their duties unless they are "plainly incompetent" or they "knowingly violate the law." Doe v. Broderick, 225 F.3d 440, 446 (4th Cir. 2000).

In ruling on an issue of qualified immunity, a court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the allegations do not give rise to a constitutional violation, no further inquiry is necessary.  Id.  If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case.  Id.

It is well-settled that prison officials are entitled to rely upon the professional judgment of trained medical personnel. Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990); Shakka v. Smith, 71 F,3d 162, 167 (4th Cir. 1995).  Thus, to establish a claim of deliberate indifference against non-medical prison personnel, a plaintiff must demonstrate that the official was personally involved in the treatment or denial of treatment, or that they deliberately interfered with the treatment, or that they tacitly authorized or were indifferent to the medical provider's

misconduct.  <u>Miltier</u>, 896 F.2d at 853.

 The DOC Defendants' Memorandum further states:

  In the present case, the plaintiff's allegations do
not rise to the level necessary to advance a claim
against these defendants, namely Unit Manager Payne,
Associate Warden Whittington, Warden Ballard, and
Commissioner Rubenstein.  First, the thought process of
these defendants is totally transparent.  These
defendants are relying on the medical judgments of the
health care professionals whom Plaintiff has seen at the
prison.  See Grievance Responses contained within
Exhibits 1 and 2 to the accompanying Motion to Dismiss.
Second, it is also clear from Plaintiff's own statement
of the case in his Complaint that the treatment provided
was not "so grossly incompetent, inadequate or excessive
to shock the conscience or to be intolerable to
fundamental fairness." <u>Miltier</u>, 896 F.2d at 851.
Plaintiff is being provided access to health care
providers.  These defendants cannot be charged with
second guessing the clinical decisions of the treatment
providers.

(# 19 at 16).

 The DOC Defendants further assert that Plaintiff's claims

against them appear to be wholly supervisory in nature, and that

Plaintiff cannot rely upon the doctrine of <u>respondeat superior</u> to

hold these defendants liable.  <u>See</u> <u>Monell</u>, 436 U.S. at 694.  (<u>Id.</u>

at 18).  They further state:

  These are not defendants who can simply cho[o]se to
accept an inmate's desired course of treatment over that
of a physician.  None of these defendants may practice
medicine.  Thus, they cannot be expected to countermand
a physician's orders, whether right or wrong.  Although
the Division of Corrections is no longer obligated to
strictly adhere to the <u>Minimum Standards for
Construction, Operation and Maintenance of Correctional
Facilities</u>, 95 C.S.R. ser. 2, by virtue of W. Va. Code §
31-20-9 (1998), the rules do provide insight as to the
limited role of the warden and commissioner with respect
to health care decisions.  Under the rule, non-medical

15

staff can "have no role in authorization of medical
care." See 95 C.S.R. ser. 2 § 14.5. As the rule also
states, "medical . . . matters involving clinical
judgments are the *sole* province of the responsible
physician . . . ." Id. § 14.2 (emphasis added). Most
importantly, "medical decisions shall be made *only* by the
responsible physician or his designee(s)." Id. § 14.5
(emphasis added). Consequently, the plaintiff has not
set forth a sufficient exception to the prohibition
against supervisory liability.

(Id. at 19).

Plaintiff's Response to the DOC Defendants' Motion to Dismiss

asserts in pertinent part:

While it may be self-serving that the defendants
would like to all "pass the proverbial buck," it is still
someone's duty and responsibility. The Commissioner
delegates his responsibility to the Warden, who in turn,
delegates his responsibility to the Associate Wardens,
who in turn, delegate[] their duty and responsibility to
the Unit Managers, Yet, no one can ever say that they
have ever "ensured that the inmates received adequate
medical care."

Just where does this responsibility lie? The Unit
Managers tell the Warden of the problems. Yet, he does
nothing. The Warden, may or may not tell the
Commissioner. He does nothing. Is it in any way not
"tacit authorization," "condonement," and/or a "custom"
of the very defendants who are named in this Civil Action
to not carry out their duty and responsibility?

(# 20 at 3)(emphasis in original). Plaintiff's Response also

spends a great deal of time arguing that the DOC Defendants ignore

the fact that the medical providers are not fulfilling the contract

they have with the DOC. (Id. at 3, 5 and 8).

Plaintiff further emphasizes that he may seek injunctive

relief from the DOC Defendants in their official capacities, even

if he is barred from pursuing monetary damages from them in that

16

capacity.  (<u>Id.</u> at 4).  Plaintiff further argues that the DOC's
grievance policy cannot properly deal with medical issues because
it allows the disclosure of confidential medical information to
prison employees who are not involved in an inmate's medical
treatment.   Thus, Plaintiff asserts that this policy creates a
"bar" to inmates' complaining about improper medical care.  (<u>Id.</u>)

Plaintiff's Response further argues as follows:

> Plaintiff has not simply "complained of a
> disagreement in treatment."  Rather, his complaints are
> very real, that he has suffered a serious injury that has
> left him virtually deformed and crippled.  **For nearly 2
> years, Plaintiff limped around in pain until an MRI
> finally diagnosed a "tear" in his knee and a couple of
> other injuries.  Now that it has been diagnosed, a
> Specialist has stated that it needs to be scoped and
> further surgery performed.  Now, this is not a
> disagreement in treatment.  It is a Specialized Medical
> Diagnosis, verified by proper scientific methods and
> tests.  (See Exhibit B). [Plaintiff] is left a cripple,
> in constant pain, and constantly without medications that
> are seriously need[ed] to keep him from going blind, and
> literally "burning" on his skin with deforming rashes
> that have left him permanently scarred.**

(<u>Id.</u> at 7)(emphasis in original).  Plaintiff's Response further
discusses the results of the MRI that he was given on or about
October 30, 2009, which Plaintiff alleges showed as follows:

> "There is an oblique linear posterior tear of the
> posterior horn of the medial meniscus.  It measures in
> thickness approximately 10 mm transverse and extends to
> the inferior articular surface of the junction of the
> body and posterior horn . . ."
>
> Posterior medial meniscus oblique tear.  Cyst formation
> is seen in the intercondylar notch.  See Exhibit-C.

(Id. at 9).[5]

The undersigned notes that, in the "Conclusion" section of his Response, Plaintiff asserts that he lost his prison job and has alleged for the first time in any of his documents that "Caucasian inmates who have a medical ailment have routinely been permitted to retain their jobs until such time that they were well enough to perform their duties.  All in excess of the 30 day time limit imposed upon the Plaintiff."  (Id. at 9).

The DOC Defendants filed a Reply which states in pertinent part:

> Plaintiff's Complaint is replete with medical treatment he received, including examinations, x-ray films, assistive devices, and medication.  Now he indicates that he also underwent an MRI of his knee on October 30, 2009, an outside orthopedic physician, Dr. Prakash Puranik of ARH Beckley Medical Associates, found that the x-rays of Plaintiff's left knee did not reveal anything significant, suspected a locked media[l] meniscal tear, strongly recommended an MRI, and prescribed Lodine 400 mg twice a day.  See Exhibit C, indicating that on December 14, 2009, Dr. Puranik interpreted the MRI as showing a medial meniscal tear with contusion of the patella and

_____

[5]  Plaintiff did not provide the actual MRI report as an Exhibit.  Rather, he provided a Clinic Note from Appalachian Regional Healthcare, Inc. made by Dr. Prakash Puranik following an examination of Plaintiff on October 2, 2009, which indicated that he believed that Plaintiff had a "locked medial meniscal tear" and "strongly recommended" that Plaintiff have an MRI.  (# 20, Ex. B).  Plaintiff also attached a Clinic Note from a follow-up visit Plaintiff had with Dr. Puranik on December 14, 2009, which confirmed that the MRI showed a medial meniscal tear and indicates that, given Plaintiff's symptoms at that time, he "might benefit from arthroscopy and medial meniscectomy" and that they would await approval of that.  (Id., Ex. C).  The undersigned has not been provided with any further information concerning Plaintiff's subsequent treatment.

possible patellofemoral arthritis, for which be might benefit from arthroscopy and medial meniscectomy.

Plaintiff contends that numerous doctors and physician assistants were requesting this MRI. Pl.'s Resp. at 8. Later, however, he admits that "within the contracted Medical, there is, as Plaintiff has evidenced 'major disagreements' as to the treatments to the inmates. One says this is needed, another says, 'nothing is needed,' while another says something is definitely wrong, and other says that, nothing wrong." Id. at 12. Plaintiff contends that Physician Assistant Pamela Ramsey told him she thought he needed to go outside to see a specialist and have an MRI. Id. at 10. Nevertheless, Exhibit D to Plaintiff's Response is a July 10, 2008, progess note from Subhash Gajendragadkar, M.D., indicating that he suspected a ligament or tendon rupture or tear and that an MRI at this stage would not be helpful and would, in fact, cause more confusion. See also Plaintiff's Complaint where he says that on January 21, 2009, he saw Dr. Dameff, who did not believe that the MRI or outside consultation with a specialist was necessary and did not believe that Mr. Johnson's knee problems were happening as described, as well as Dr. Loudin [sic; Lauder], who advised him that in her opinion, the problem was with his muscles. Pl.'s Complaint at 16-17.

* * *

There is no reason why the Supervisory Defendants should not be entitled to rely upon the expertise of the health care providers. Id. Where the supervisory defendants did not neglect the medical needs of the Plaintiff and where the prison medical professionals engaged in a course of treatment, the supervisory defendants were "beyond any doubt not liable to the Plaintiff under any conceivable state of facts." Id. at 855 (citing Boyce v. Alizaduh, 595 F.2d 948, 953 (4th Cir. 1979)).

* * *

Even if we are to assume that Defendants Payne, Whittington, Ballard, and Rubenstein as supervisory prison officials knew of the Plaintiff's medical needs, the fact that the Plaintiff has been receiving a course of treatment for his medical needs negates his allegations against these Defendants. Reading

19

> Plaintiff's Complaint in a light most favorable to him
> demonstrates that Charles Johnson has failed to plead
> that he has, in fact, been deprived of medical treatment.
> According to his own pleadings, he received multiple
> visits with medical providers at the correctional
> facility; x-rays; an MRI; treatment by an outside
> orthopedic physician; medications; and assistive devices,
> like a cane, knee brace and wheelchair. Plaintiff even
> concedes that Defendant Janet Payne as his Unit Manager
> made numerous calls and/or emails to assist him in
> getting medications. Pl.'s Resp. at 11.

(# 21 at 4-7).

The DOC Defendants also briefly address Plaintiff's contention that he was not treated similarly to Caucasian inmates who also had health issues that prohibited them from engaging in their prison employment for longer than 30 days. The DOC Defendants' Reply asserts that Plaintiff cannot succeed with any sort of constitutional claim on this basis because the law is clear that an inmate does not have a liberty or property interest in prison employment. See, e.g., Anderson v. Hall, 763 F.2d 325 (8th Cir. 1985); James v. Quinlan, 866 F.2d 627 (3d Cir. 1989); Williams v. Farrior, 334 F. Supp.2d 898 (E.D. Va. 2004). (Id. at 7).

Plaintiff's granted Sur-Reply largely repeats arguments and points addressed in his Response to the Motion to Dismiss. Additionally, Plaintiff argues that the DOC personnel and medical staff have failed to comply with DOC Operating Procedures, which state that, when the Health Services Administrator is someone other than a physician, final medical judgments shall rest with a single designated physician. (# 22 at 2 and Exhibit A, Operational

Procedure # 4.36, MEDICAL SERVICES - ADMINISTRATION).  Plaintiff also cites case law related to Social Security cases in which the Fourth Circuit has held that "the report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record." Millner v. Schweiker, 725 F.2d 243, 245 (4th Cir. 1984).  The undersigned finds these arguments to be specious.

Plaintiff has alleged nothing more than the fact that the DOC Defendants were made aware of his medical issues through the meetings with Plaintiff and the medical staff and through the grievance process, and that they failed to take any action.  A review of the grievance documents attached to the DOC Defendants' Motion to Dismiss, indicates that the DOC Defendants inquired of the medical staff concerning the treatment Plaintiff was receiving, and relied upon the information provided by Naomi Roberts concerning Plaintiff' medical treatment in their denials of the grievances.  (# 18 at Exs. 1 and 2).  The DOC Defendants were entitled to rely upon the professional medical judgment of the health care providers when reviewing Plaintiff's grievances concerning his medical treatment.

Accordingly, the undersigned proposes that the DOC Defendants should be accorded qualified immunity on Plaintiff's claims against them.  Therefore, the undersigned further proposes that the presiding District Judge **FIND** that Plaintiff's Complaint fails to

21

state a claim against defendants Ballard, Payne, Rubenstein, and Whittington, concerning their conduct surrounding Plaintiff's medical care.  It is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motion to Dismiss filed by David Ballard, Janet Payne, Jim Rubenstein, and Tim Whittington (# 18) and **DENY** the Plaintiff's motions requesting that this civil action not be dismissed (## 16 and 17).

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), the Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections), and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Synder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S.

22

140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on opposing parties and Chief Judge Goodwin.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Plaintiff and counsel of record.

_____July 15, 2010_____                    _Mary E. Stanley_____
        Date                         Mary E. Stanley
                                     United States Magistrate Judge